**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------------

|  |  |
|---|---|
| ANDREA L. VAN VORST, KENNETH MAHNKEN, YVETTE SOTO, and MARTIN J. WEINER, | **NO. 15-cv-1667** |
|  | **ECF CASE** |
| Plaintiffs, |  |
| v. | **COMPLAINT** |
| LUTHERAN HEALTHCARE d/b/a LUTHERAN MEDICAL CENTER, | **JURY TRIAL DEMANDED** |
| Defendant. |  |

----------------------------------------------------------------

Plaintiffs, ANDREA L. VAN VORST, KENNETH MAHNKEN, YVETTE SOTO, and MARTIN J. WEINER ("Plaintiffs"), by and through their undersigned counsel, EISENBERG & BAUM, LLP, hereby sue Defendant, LUTHERAN HEALTHCARE d/b/a LUTHERAN MEDICAL CENTER ("Defendant" or "Lutheran Medical Center") and allege as follows:

## PRELIMINARY STATEMENT

1.    Plaintiffs are deaf individuals who communicate primarily in American Sign Language ("ASL"), which is their expressed, preferred, and most effective means of communication. Defendant, Lutheran Healthcare d/b/a/ Lutheran Medical Center, discriminated against Plaintiffs by refusing to provide reasonable accommodations for their disability, despite their repeated requests for effective communication. Defendant discriminated against Plaintiffs by failing to provide onsite ASL interpreters when necessary and by providing malfunctioning Video

1

Remote Interpreting ("VRI"[1]) systems.

2.      Lip-reading, the ability to understand the speech of another by watching the speaker's lips, is an extremely speculative means of communication and no substitute for direct doctor patient communication through a qualified sign language interpreter. Only a small amount of the spoken sounds of aural language are visible, and many of those appear identical on the lips. Even the most adept lip-readers, in an ideal one-to-one situation, have been found to understand only 26% of what is said. Despite this, Lutheran Medical Center often relied on this ineffective means of communication instead of properly accommodating Plaintiffs' disability.

3.      Reliance by deaf individuals upon family members to interpret medical communications for them has been found to be unwise and dangerous, insofar as family members are generally not trained to act as interpreters, particularly in medical and hospital settings. Family members often are untrained in accurately and precisely interpreting and conveying to the deaf individual the full and complete content of medical communications. In addition, family members are generally too personally and emotionally involved with the deaf patient to act impartially with the emotional detachment that is necessary of qualified sign language interpreters, particularly in medical settings and communications. Despite this, Lutheran Medical Center often forced some of the Plaintiffs' family members to interpret instead of properly accommodating Plaintiffs' disability.

4.      Plaintiffs bring this action to compel Defendant to cease unlawful discriminatory practices and implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity to participate in and benefit from Defendant's services. Plaintiffs seek declaratory, injunctive, and equitable relief; compensatory and punitive

---

[1] Video remote interpreting is a video telecommunication service that uses devices such as web cameras or videophones to provide sign language or spoken language interpreting services through a remote or offsite interpreter.

damages; and attorneys' fees and costs to redress Defendant's unlawful discrimination on the basis of disability in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 USC § 12181 et seq. and its implementing regulation, 28 C.F.R. Part 36; Section 504 of the Rehabilitation Act of 1973, 29 USC § 794; the New York State Human Rights Law ("NYHRL"), Article 15 of the N.Y. Executive Law § 290, et seq.; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et. seq.; and other state and common law causes of action.

## THE PARTIES

5.      Plaintiff ANDREA L. VAN VORST is an individual residing at 155 74th St., Brooklyn, NY 11209, a distance of one and three-tenths (1.3) miles from Defendant's hospital. Ms. Van Vorst is deaf, primarily communicates in American Sign Language, and is substantially limited in the major life activities of hearing and speaking within the meaning of the ADA, the Rehabilitation Act, the NYHRL, and the NYCHRL.

6.      Plaintiff KENNETH MAHNKEN is an individual residing at 1137 63rd St., Apt A-11, Brooklyn, NY 11219, a distance of one and nine-tenths (1.9) miles from Defendant's hospital. Mr. Mahnken is deaf, primarily communicates in American Sign Language, and is substantially limited in the major life activities of hearing and speaking within the meaning of the ADA, the Rehabilitation Act, the NYHRL, and the NYCHRL.

7.      Plaintiff YVETTE SOTO is an individual residing at 265 55th St., Brooklyn, NY 11220, a distance of two-tenths (0.2) of a mile from Defendant's hospital. Ms. Soto is deaf, primarily communicates in American Sign Language, and is substantially limited in the major life activities of hearing and speaking within the meaning of the ADA, the Rehabilitation Act, the NYHRL, and the NYCHRL.

8.      Plaintiff MARTIN J. WEINER is an individual residing at 1640 Ocean Parkway,

Apt. C-51, Brooklyn, NY 11223, a distance of four and two-tenths (4.2) miles from Defendant's hospital. Mr. Weiner is deaf, primarily communicates in American Sign Language, and is substantially limited in the major life activities of hearing and speaking within the meaning of the ADA, the Rehabilitation Act, the NYHRL, and the NYCHRL.

9.      Defendant, LUTHERAN HEALTHCARE d/b/a LUTHERAN MEDICAL CENTER, at all times hereinafter mentioned, is an organization that was and still is licensed and doing business in the State of New York, with a principal place of business at 150 55th Street, Brooklyn, NY 11220. It is a place of public accommodation under Federal, State and Local anti-discrimination laws and is a recipient of federal financial assistance, and is therefore is subject to the requirements of the ADA, the Rehabilitation Act, the NYHRL, and the NYCHRL.

## JURISDICTION & VENUE

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 1343 for claims arising under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title III of the ADA, 42 U.S.C §§ 12181, et seq. This Court has supplemental jurisdiction over Plaintiffs' state and local law claims pursuant to 28 U.S.C. § 1367.

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant has sufficient contacts with this District to subject it to personal jurisdiction at the time this action is commenced, and the acts and omissions giving rise to this Complaint occurred within this District.

## STATEMENT OF FACTS AS TO PLAINTIFF ANDREA L. VAN VORST

12.      Ms. Van Vorst has been treating for various health conditions at Lutheran Medical Center beginning on or about July 25, 2012.

13.      Lutheran Medical Center often did not provide Ms. Van Vorst with effective accommodations for her disability of deafness, despite her requests.

4

14.    Ms. Van Vorst has also received treatment from dentists through the Family Health Center Network of Lutheran Medical Center beginning on or about April of 2012, and was not provided accommodations for her disability, despite her requests during approximately fifteen visits.

15.    On July 23, 2012, Ms. Van Vorst attended pre-admission testing for an upcoming surgery.

16.    Ms. Van Vorst was not provided with an ASL interpreter during the pre-admission testing despite her request for accommodations.

17.    On this date, she underwent an electrocardiogram and other testing, but was unable to communicate with staff about her upcoming surgery, and was also unable to have her test results communicated to her without the aid of an ASL interpreter.

18.    From July 25, 2012 through July 26, 2012, Ms. Van Vorst returned to Lutheran Medical Center for open cholecystectomy surgery.

19.    Medical records repeatedly indicate that Ms. Van Vorst uses Sign Language and further indicate that she is deaf and that Sign Language is one of her communication needs.

20.    A section entitled "Interpreter Requirements" on the consent forms from these dates was left blank.

21.    Ms. Van Vorst signed these consent forms without the benefit of understanding them in her native language, thus depriving her of the opportunity to give informed consent.

22.    Ms. Van Vorst requested an on-site ASL interpreter, but Lutheran Medical Center declined to provide one, and did not provide an interpreter at any time during this visit.

23.    On January 9, 2013, Ms. Van Vorst went to the Emergency Room at Lutheran Medical Center to seek treatment for esophagitis and weight loss.

24.     A section entitled "Interpreter Requirements" on the consent forms from this visit was left blank.

25.     Ms. Van Vorst signed these consent forms without the benefit of understanding them in her native language, thus depriving her of the opportunity to give informed consent.

26.     Ms. Van Vorst requested an onsite ASL interpreter, but Lutheran Medical Center declined to provide one, and did not provide an interpreter at any time during this visit.

27.     In October of 2013, Ms. Van Vorst underwent a mammogram at Lutheran Medical Center and was not provided with an ASL interpreter during this procedure despite her request for accommodations.

28.     On July 10, 2014, Ms. Van Vorst went to the Emergency Room at Lutheran Medical Center to seek treatment of an infection of her foot.

29.     Ms. Van Vorst requested an onsite ASL interpreter, but Lutheran Medical Center declined to provide one, and did not provide an interpreter at any time during her three-day stay.

30.     Medical records from this date indicate that Ms. Van Vorst's preferred language is American Sign Language; state "Barriers to learning: Language barrier"; state "Desire to learn: Unknown."; indicate that Ms. Van Vorst is "deaf mute"; and state "Additional history obtained from her caretaker, old chart. pcp".

31.     When Ms. Van Vorst made her request for an on-site ASL interpreter, the nurse ignored her and walked away.

32.     Medical staff gestured that they were considering amputating Ms. Van Vorst's foot, which made her very frightened.

33.     Since she was frightened and did not want her foot cut off without knowing why, and since no one was communicating with her, Ms. Van Vorst was forced to leave the hospital.

34.     On August 26, 2014, Ms. Van Vorst underwent surgery on her ankle and foot at Lutheran Medical Center.

35.     Ms. Van Vorst again requested an onsite ASL interpreter, but Lutheran Medical Center declined to provide one.

36.     Medical records from this visit indicate that Ms. Van Vorst's language is "AM Sign Lang Intrpr" indicating that a Sign Language interpreter is needed.

37.     A section entitled "Interpreter Requirements" on one of the consent forms from this visit was left blank.

38.     Ms. Van Vorst signed these consent forms without the benefit of understanding them in her native language, thus depriving her of the opportunity to give informed consent.

39.     Only on one consent form, in the section entitled "Interpreter Requirements" does it state that Ms. Van Vorst's language is Sign.

40.     Lutheran Medical Center staff then attempted to use the VRI service to obtain informed consent for the surgery.

41.     Medical records from Ms. Van Vorst's post-op state: "Patient is Deaf/Mute. Communicates with Signs and Jestures. Nods for Yes and Move Head Side to Side for No."

42.     During all of Ms. Van Vorst's hospitalizations, Lutheran Medical Center denied her the right to be accommodated for her disability of deafness.

43.     Ms. Van Vorst was also denied the opportunity to participate in her medical treatment by asking questions of her medical providers and having them explain her pre-admission testing, diagnosis, prognosis, discharge instructions and follow up treatment in a manner in which she could understand.

44.     Ms. Van Vorst is deterred from accessing Lutheran Medical Center's healthcare

services because of the discrimination she has faced and expects to face in the future.

45.     It is reasonably foreseeable that Ms. Van Vorst will continue to visit Lutheran Medical Center, either by choice or necessity, as she lives nearby and often requires medical treatment.

46.     Based on Defendant's previous and repeated denials of effective communication for Ms. Van Vorst, it is reasonably foreseeable that a denial of effective communication will occur again when she returns to Lutheran Medical Center.

47.     Defendant's failure to provide on-site qualified sign language interpreters made Ms. Van Vorst's hospitalizations more difficult for her because it prevented effective communication between Ms. Van Vorst and Defendant's staff.

48.     Defendant intentionally discriminated against Ms. Van Vorst and acted with deliberate indifference to her communication needs, causing her to endure humiliation, fear, anxiety, and emotional distress.

## STATEMENT OF FACTS AS TO PLAINTIFF KENNETH MAHNKEN

49.     Mr. Mahnken has been treating for various critical health conditions at Lutheran Medical Center beginning in 2012.

50.     Lutheran Medical Center often failed to provide Mr. Mahnken with effective accommodations for his disability of deafness despite his requests.

51.     On August 13, 2012, Mr. Mahnken attended pre-admission testing for an upcoming surgery.

52.     Lutheran Medical Center declined to provide an onsite ASL interpreter during this pre-admission testing.

53.     On August 23, 2012, Mr. Mahnken underwent surgery for kidney stones at

8

Lutheran Medical Center.

54.     Medical records from this visit indicate that "Patient is Deaf"; and that Mr. Mahnken's language is "AM Sign Lang Intrpr" indicating that an ASL interpreter is needed.

55.     During his treatment, Mr. Mahnken's family was forced to attempt to interpret for Lutheran Medical Center's staff and doctors, including the discharge instructions.

56.     Medical records state that there was a problem with the VRI during this visit and that Mr. Mahnken's family interpreted for him.

57.     A section entitled "Interpreter Requirements" on some of the consent forms from this visit was left blank.

58.     Mr. Mahnken signed these consent forms without the benefit of understanding them in his native language, thus depriving him of the opportunity to give informed consent.

59.     On one consent form, in the section entitled "Interpreter Requirements" it is written that Mr. Mahnken's language is Sign.

60.     Lutheran Medical Center staff then attempted to use the VRI service to obtain informed consent for the surgery.

61.     On January 15, 2013, Mr. Mahnken attended pre-admission testing for an upcoming surgery.

62.     Lutheran Medical Center declined to provide an onsite ASL interpreter during this pre-admission testing.

63.     On January 17, 2013, Mr. Mahken again underwent surgery for kidney stones at Lutheran Medical Center.

64.     Medical records indicate that "Patient is Deaf" and that Mr. Mahnken's language is "AM Sign Lang Intrpr" indicating that a Sign Language interpreter is needed.

65.    Lutheran Medical Center did not provide a live interpreter, but rather used a form of VRI, which kept freezing.

66.    Lutheran Medical Center staff also relied on Mr. Mahnken's uncle to attempt to interpret for him and to provide Mr. Mahnken's medical history,

67.    Lutheran Medical Center staff communicated with Mr. Mahnken's uncle instead of Mr. Mahnken, who was the patient, directly due to Mr. Mahnken's disability of deafness.

68.    A section entitled "Interpreter Requirements" on some of the consent forms from this visit was left blank.

69.    Mr. Mahnken signed these consent forms without the benefit of understanding them in his native language, thus depriving him of the opportunity to give informed consent.

70.    On one consent form, the section entitled "Interpreter Requirements" states that Mr. Mahnken's language is Sign Language.

71.    Lutheran Medical Center staff then attempted to use the VRI service to obtain informed consent for the surgery.

72.    During discharge, Lutheran Medical Center staff used Mr. Mahnken's uncle again to attempt to interpret the discharge instructions.

73.    Medical records indicate that the physician's assistant and Dr. Calciano both spoke to Mr. Mahnken's uncle and gave him the discharge instructions, leaving Mr. Mahnken without the right to participate in his medical treatment and to ask questions about his diagnosis, prognosis and any follow up treatment.

74.    Between March 16, 2013 and March 19, 2013 Mr. Mahnken went to Lutheran Medical Center for treatment of seizures.

75.    Medical records from this visit indicate that "Patient is Deaf" and that Mr.

10

Mahnken's language is "AM Sign Lang Intrpr" indicating that a Sign Language interpreter is needed.

76.     On a Multidisciplinary Patient Education Record, a section asking if an interpreter is required for education is not checked, but it does indicate that Mr. Mahnken's language is Sign Language and that he is "deaf and mute".

77.     It is also noted on this form that the interpreter used during Mr. Mahnken's discharge was his uncle.

78.     Medical records from this date indicate that Mr. Mahnken is "deaf and mute" and "nearly nonverbal"; that he suffers from "chronic illness."; and that Lutheran Medical Center staff and physicians obtained Mr. Mahnken's medical history through his uncle, who was again forced to attempt to interpret for him.

79.     Lutheran Medical Center failed to effectively accommodate Mr. Mahnken's disability throughout this visit.

80.     From April 15, 2013 and April 19, 2013, Mr. Mahnken returned to Lutheran Medical Center for further treatment of nervous system disorders.

81.     Medical records from this visit indicate that "Patient is Deaf" and that Mr. Mahnken's language is "AM Sign Lang Intrpr" indicating that an ASL interpreter is needed.

82.     These medical records also indicate that Mr. Mahnken is "deaf" and "nonverbal."

83.     In a special needs section on another form, a nurse indicated that Mr. Mahnken's language is, "Deaf! + Mute".

84.     The Multidisciplinary Patient Education Record from this visit indicates that Mr. Mahnken requires an interpreter for education, that he is deaf and mute, that his language is Sign Language, and that his uncle was used as an interpreter.

85.     A section entitled "Interpreter Requirements" on one authorization form from this visit was left blank and it was signed by Mr. Mahnken's uncle and not Mr. Mahnken, the patient.

86.     Mr. Mahnken signed these consent forms without the benefit of understanding them in his native language, thus depriving him of the opportunity to give informed consent.

87.     Lutheran Medical Center then attempted to use the VRI service to obtain informed consent for the surgery.

88.     Lutheran Medical Center did not provide a live interpreter, but rather used a form of VRI that kept freezing, Mr. Mahnken's brother, and Mr. Mahnken's uncle to obtain Mr. Mahnken's consent to treatment.

89.     Lutheran Medical Center failed to effectively effectively accommodate Mr. Mahnken's disability throughout this visit.

90.     Mr. Mahnken continued rehabilitation treatment at Lutheran Medical Center from April 19, 2013 until April 26, 2013.

91.     Despite records indicating that Mr. Mahnken is sensory impaired and "deaf and mute," the person who filled out the records also checked "no" in a box indicating whether Mr. Mahnken required an interpreter for education.

92.     Medical records from this visit further indicate that Mr. Mahnken utilizes "American Sign Language as mode of communication" and that he had "Impaired communication."

93.     Despite these notations in the record, staff forced him to utilize cryptic gestures and a communication board, leaving him feeling completely helpless as no communication was provided in a language that he was able to understand.

94.     Medical records from this visit also state that "Pt's immediate and delayed memory was assisted with a visual word list due to auditory impairment. Pt is irritable and feels that the

staff is not honoring his request to be transferred to a facility in Long Island in which offers Sign Language Therapy services."

95.     Lutheran Medical Center failed to effectively accommodate Mr. Mahnken's disability throughout this visit and would often not provide an ASL interpreter to him despite his requests.

96.     On May 14, 2013, Mr. Mahnken attended pre-admission testing for an upcoming surgery.

97.     Lutheran Medical Center declined to provide an onsite ASL interpreter during this pre-admission testing.

98.     On the Pre-Admission Instruction Record, where it indicates "Readiness to Learn" it is written "Uncle William" but does not acknowledge the patient, Mr. Mahnken.

99.     From May 21, 2013 to May 22, 2013, Mr. Mahnken returned to Lutheran Medical Center for further treatment of nervous system disorders.

100.    Medical records from this visit indicate that "Patient is Deaf" and that Mr. Mahnken's language is "AM Sign Lang Intrpr" indicating that a Sign Language interpreter is needed.

101.    Medical records also indicate that Mr. Mahnken is "Deaf Non-Verbal and instruct to "Call Brother Rick".

102.    The Multidisciplinary Patient Education Record from this visit indicates that Mr. Mahnken is "sensory impaired," yet the person who filled out the records also checked "no" in a box asking whether Mr. Mahnken required an interpreter for education.

103.    Because Lutheran Medical Center provided VRI that kept freezing during this visit, the hospital staff had to rely upon Mr. Mahnken's family to attempt to interpret vital information

to him instead of effectively communicating with Mr. Mahnken himself through an onsite ASL interpreter, which was the requested accommodation.

104.    On June 17, 2014 Mr. Mahnken again went to Lutheran Medical Center for further treatment of nervous system disorders.

105.    Medical records on this date indicate that "Patient is Deaf" and that Mr. Mahnken's language is "AM Sign Lang Intrpr" indicating that a Sign Language interpreter is needed.

106.    A section entitled "Interpreter Requirements" on some of the consent forms from this visit was left blank.

107.    Mr. Mahnken signed consent forms without the benefit of understanding them in his native language, thus depriving him of the opportunity to give informed consent.

108.    Only on one consent, form in the section entitled "Interpreter Requirements" is it written that Mr. Mahnken's language is Sign Language and the Interpreter was "Ryan."

109.    Medical records also state "Pt Deaf-Mute translator need AM of procedure."

110.    Because Lutheran Medical Center provided VRI that kept freezing during this visit, the hospital staff had to rely upon Mr. Mahnken's family to attempt to interpret vital information to him instead of effectively communicating with Mr. Mahnken himself through an onsite ASL interpreter, which was the requested accommodation.

111.    On September 18, 2014, Mr. Mahnken attended pre-admission testing for an upcoming surgery.

112.    Lutheran Medical Center finally provided an onsite ASL interpreter during this pre-admission testing.

113.    From September 24, 2014 through September 25, 2014, Mr. Mahnken again went to Lutheran Medical Center for lumbar laminectomy surgery.

14

114.    Medical records from this visit indicate that "Patient is Deaf" and that Mr. Mahnken's language is "AM Sign Lang Intrpr" indicating that a Sign Language interpreter is needed.

115.    Medical records also indicate, under the name for an interpreter on the Patient Assessment Database form, "sign language when needed".

116.    During this hospitalization, the hospital staff relied upon Mr. Mahnken's uncle to provide his medical history, but did not gather this information from Mr. Mahnken himself due to his disability.

117.    A section entitled "Interpreter Requirements" on the consent forms that Mr. Mahnken signed during this hospitalization was left blank.

118.    Mr. Mahnken signed these consent forms without the benefit of understanding them in his native language, thus depriving him of the opportunity to give informed consent.

119.    During this stay at Lutheran Medical Center, Mr. Mahnken wrote a note to a Lutheran Medical Center employee, stating: "I AM DEAF / I DON'T UNDERSTAND YOU SAY / I NEEDS DEAF SIGN LAGUAGE PRESON / HERE NO WORK COMPUTER NO WORKS."

120.    In response, the Lutheran Medical Center employee wrote on the same piece of paper, "Hospital Does not have a Sign Language person. Sorry".

121.    Due to Mr. Mahnken's repeated requests for an interpreter, Lutheran Medical Center finally provided one to him during the pre-anesthesia assessment and at the time of discharge.

122.    Despite repeated requests for interpreters at multiple visits, Lutheran Medical Center refused and failed to effectively accommodate Mr. Mahnken's disability of deafness during critical medical treatments and surgery.

15

123.    Mr. Mahnken had to repeatedly request interpreter despite his obvious need for one, and the hospital staff relied on his family to attempt to interpret important information, including his medical history and discharge instructions, to him.

124.    When the staff attempted to utilize the VRI it often would not work and/or would freeze.

125.    During all of Mr. Mahnken's hospitalizations, Lutheran Medical Center denied him the right to be provided with the requested accommodations for his disability of deafness.

126.    Mr. Mahnken was also denied the opportunity to participate in his medical treatment by asking questions of his medical providers and having them explain his pre-admission testing, diagnosis, prognosis, discharge instructions and follow up treatment in a manner in which he could understand.

127.    Mr. Mahnken is deterred from accessing Lutheran Medical Center's healthcare services because of the discrimination he has faced and expects to face in the future.

128.    It is reasonably foreseeable that Mr. Mahnken will continue to visit Lutheran Medical Center, either by choice or necessity, as he lives nearby and often requires medical treatment for critical medical conditions.

129.    Based on Defendant's previous and repeated denials of effective communication for Mr. Mahnken, it is reasonably foreseeable that a denial of effective communication will occur again when he returns to Lutheran Medical Center.

130.    Defendant's failure to provide on-site qualified sign language interpreters made Mr. Mahnken's hospitalizations more difficult for him because it prevented effective communication between Mr. Mahnken and Defendant's staff.

131.    Defendant intentionally discriminated against Mr. Mahnken and acted with

deliberate indifference to his communication needs, causing him to endure humiliation, fear, anxiety, and emotional distress.

## STATEMENT OF FACTS AS TO PLAINTIFF YVETTE SOTO

132.   Ms. Soto visits Lutheran Medical Center on a regular basis, beginning in 2012, to receive care from several different doctors through the Family Health Center Network of Lutheran Medical Center, in addition to being a patient at the hospital itself.

133.   Lutheran Medical Center often did not provide Ms. Soto with effective accommodations for her disability of deafness despite her requests.

134.   On June 27, 2013 and September 6, 2013, Ms. Soto visited Lutheran Medical Center for eye care appointments.

135.   On January 3, 2014, Ms. Soto visited Lutheran Medical Center for an eye care appointment with Dr. Zwerling.

136.   On January 28, 2014, Ms. Soto visited Lutheran Medical Center for a mammogram.

137.   During this visit, the VRI kept freezing, and effective communication did not take place between Ms. Soto and Defendant's staff because no other accommodation was provided.

138.   On February 6, 2014, Ms. Soto visited Lutheran Medical Center's eye clinic.

139.   Again, the VRI kept freezing, and effective communication did not take place between Ms. Soto and Defendant's staff because no other accommodation was provided.

140.   On February 28, 2014, Ms. Soto visited Lutheran Medical Center for treatment with Dr. Gopal.

141.   On January 23, 2014, June 30, 2014, September 3, 2014, September 29, 2014 and December 29, 2014, Ms. Soto visited Lutheran Medical Center for treatment with Dr. Alcantara.

142.   Ms. Soto regularly requested interpreters and other accommodations at these

17

appointments, but Lutheran Medical Center declined to provide them.

143.    During all of Ms. Soto's visits to Lutheran Medical Center, she was denied the right to be provided with the requested accommodations for her disability of deafness.

144.    Ms. Soto was also denied the opportunity to participate in her medical treatment by asking questions of her medical providers and having them explain her diagnosis, prognosis, and follow up treatment in a manner in which she could understand.

145.    Ms. Soto is deterred from accessing Lutheran Medical Center's healthcare services because of the discrimination she has faced and expects to face in the future.

146.    It is reasonably foreseeable that Ms. Soto will continue to visit Lutheran Medical Center, either by choice or necessity, as she lives nearby and often requires medical treatment.

147.    Based on Defendant's previous and repeated denials of effective communication for Ms. Soto, it is reasonably foreseeable that a denial of effective communication will occur again when she returns to Lutheran Medical Center.

148.    Defendant's failure to provide on-site qualified sign language interpreters made Ms. Soto's medical treatment more difficult for her because it prevented effective communication between Ms. Soto and Defendant's staff.

149.    Defendant intentionally discriminated against Ms. Soto and acted with deliberate indifference to her communication needs, causing her to endure humiliation, fear, anxiety, and emotional distress.

### STATEMENT OF FACTS AS TO PLAINTIFF MARTIN J. WEINER

150.    Mr. Weiner has been treating for various health conditions at Lutheran Medical Center since April of 2012.

151.    Mr. Weiner received treatment from doctors through Family Health Center

18

Network of Lutheran Medical Center and from the hospital itself.

152. Lutheran Medical Center often failed to provide Mr. Weiner with effective accommodations for his disability of deafness, despite his requests.

153. During May of 2012, Mr. Weiner contacted a management employee of Lutheran Medical Center to express his frustration with malfunctioning VRI.

154. The management employee, who was responsible for coordinating interpreter services for multiple languages (including Russian, Chinese, Hebrew, Arabic, and Spanish) was rude and indifferent to Mr. Weiner's request for onsite ASL interpreters.

155. On August 17, 2012, Mr. Weiner had a broken nail removed in the Emergency Room of Lutheran Medical Center.

156. Mr. Weiner requested an onsite ASL interpreter during this treatment, but Lutheran Medical Center declined to provide one.

157. Mr. Weiner signed a consent form during this hospitalization without the benefit of understanding it in his native language, thus depriving him of the opportunity to give informed consent.

158. The consent form , in a section entitled "Interpreter Requirements" indicates that Mr. Weiner's language is American Sign Language.

159. On January 4, 2013, Mr. Weiner attended pre-admission testing for an upcoming surgery.

160. Lutheran Medical Center declined to provide an onsite ASL interpreter during this pre-admission testing.

161. On January 10, 2013, Mr. Weiner underwent tendon ganglion surgery to treat a cyst in his right thumb.

162.    Medical records on this date indicate that Mr. Mahnken's language is "AM Sign Lang Intrpr" indicating that a Sign Language interpreter is needed.

163.    Lutheran Medical Center did not provide an interpreter before, during, or after the surgery despite medical records indicating that Mr. Weiner's preferred language is Sign.

164.    Mr. Weiner again requested an onsite ASL interpreter when he was in the recovery room after the surgery, but he was told that Lutheran Medical Center did not have access to a live interpreter.

165.    Medical records state "*Pt Request LIVE Interpreter in Recovery Room  1/9 (6537 Ext) Spoke to Andrew Barba pt. rel. Do Not Have Live Interp".

166.    A section entitled "Interpreter Requirements" on the consent forms from this visit was left blank.

167.    Mr. Weiner signed numerous consent forms without the benefit of understanding them in his native language, thus depriving him of the opportunity to give informed consent.

168.    On June 9, 2014, Mr. Weiner went to the Emergency Room of Lutheran Medical Center due to painful urination.

169.    The nurse who examined Mr. Weiner tried to communicate with Mr. Weiner using spoken English, and even talked at Mr. Weiner while her back was turned to him.

170.    The nurse further refused to attempt to communicate with Mr. Weiner through writing.

171.    During all of Mr. Weiner's hospitalizations, Lutheran Medical Center denied him the right to be provided with the requested accommodations for his disability of deafness.

172.    Mr. Weiner was also denied the opportunity to participate in his medical treatment by asking questions of his medical providers and having them explain his pre-admission testing,

diagnosis, prognosis, discharge instructions and follow up treatment in a manner in which he could understand.

173.    Mr. Weiner is deterred from accessing Lutheran Medical Center's healthcare services because of the discrimination he has faced and expects to face in the future.

174.    It is reasonably foreseeable that Mr. Weiner will continue to visit Lutheran Medical Center, either by choice or necessity, as he lives nearby and often requires medical treatment.

175.    Based on Defendant's previous and repeated denials of effective communication for Mr. Weiner, it is reasonably foreseeable that a denial of effective communication will occur again when he returns to Lutheran Medical Center.

176.    Defendant's failure to provide on-site qualified sign language interpreters made Mr. Weiner's hospitalizations more difficult for him because it prevented effective communication between Mr. Weiner and Defendant's staff.

177.    Defendant intentionally discriminated against Mr. Weiner acted with deliberate indifference to his communication needs, causing him to endure humiliation, fear, anxiety, and emotional distress.

## STATEMENT OF FACTS AS TO ALL PLAINTIFFS

178.    Defendant did not, at any point, provide Plaintiffs with adequate auxiliary aids and services to enable them to effectively communicate with Defendant's staff, despite Plaintiffs' requests for an onsite ASL interpreter.

179.    In most instances, effective communication could not have taken place without the aid of a qualified ASL interpreter.

180.    Defendant knowingly limited Plaintiffs to the little communication they could achieve through vague gestures, cryptic notes, and the few words Plaintiffs could understand

21

through reading lips.

181.    Plaintiffs were unable to understand the procedures they underwent and/or the medication they were provided.

182.    Plaintiffs were further unable to give informed consent.

183.    Upon information and belief, Defendant refuses to hire qualified on-site sign language interpreters as a matter of policy, without regard to whether VRI services or other methods will provide effective communication.

184.    Defendant has demonstrated and continues to demonstrate, through its interactions with Plaintiffs, that Defendant's staff is not properly trained on how to interact with deaf individuals and/or how to utilize VRI systems, resulting in significant delays and communication breakdowns in critical care medical situations.

185.    Defendant, as a health care provider, knew or should have known of its obligations under the ADA, Section 504 of the Rehabilitation Act, NYHRL, and NYCHRL to provide accommodations to individuals with disabilities, including individuals who are deaf and/or hearing impaired.

186.    Defendant, as a health care provider, knew or should have known that it had an obligation to individuals who are deaf and/or hearing impaired under the ADA, Section 504 of the Rehabilitation Act, the NYHRL, and the NYCHRL to develop policies to promote compliance with these statutes and to provide reasonable accommodations, including but not limited to the provision of an ASL interpreter to ensure effective communication.

187.    Defendant and its physicians and staff knew or should have known that their actions and/or inactions created an unreasonable risk of causing Plaintiffs greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a hearing person.

188.    As a result of the actions and/or inactions of Defendant and its physicians and staff, Plaintiffs were denied information that is readily and routinely provided to hearing persons, including but not limited to information regarding: the reasons for their admissions and treatment given; the purposes of the treatments being provided; the common risks and/or benefits of surgery and treatments given; the common risks, side effects and benefits of the medication given, as well as the specific dosage range for the medications given; alternative available treatments; the approximate length of their care; the potential side effects of stopping treatment; and/or aftercare instructions, including information regarding any need to continue treatments or arrangements needed to be made for follow up care.

189.    As a result of the actions and/or inactions of Defendant and its physicians and staff, Plaintiffs were denied the same opportunities that are readily and routinely provided to hearing persons to make decisions regarding treatments and/or to give consent to such treatments.

190.    The use of VRI to obtain informed consent is especially inappropriate when the remote translator cannot read whatever documents the patient is to sign to indicate consent.

191.    It is reasonably foreseeable that Plaintiffs will continue to visit Defendant's facilities and/or seek Defendant's health care services in the future, as Plaintiffs each live close to Lutheran Medical Center.

192.    It is reasonably foreseeable that Plaintiffs will continue to visit Defendant's facilities and/or seek Defendant's health care services in the future, as all Plaintiffs have visited Lutheran Medical Center on multiple occasions in the past for different healthcare needs.

193.    It is reasonably foreseeable that Defendant will fail to accommodate Plaintiffs or other deaf individuals in the future, as Defendant's conduct is part of a discriminatory and deliberately indifferent policy, pattern, or practice.

194.     Based on Defendant's previous refusal to effectively accommodate Plaintiffs, it is reasonably foreseeable that Defendant will continue to refuse to effectively accommodate Plaintiffs again in the future.

195.     Defendant intentionally discriminated against Plaintiffs and acted with deliberate indifference to their communication needs, causing them to endure humiliation, fear, anxiety, and emotional distress.

## COUNT I: VIOLATIONS OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT

196.     Plaintiffs repeat and reallege all preceding paragraphs in support of this claim.

197.     At all times relevant to this action, Title III of the ADA, 42 U.S.C. §§ 12181, et seq. has been in full force and effect and has applied to Defendant's conduct.

198.     At all times relevant to this action, the United States Department of Justice regulations implementing Title III of the ADA, 28 C.F.R. Part 36, were in full force and effect and applied to the Defendant's conduct.

199.     At all times relevant to this action, Plaintiffs have been substantially limited in the major life activities of hearing and speaking, and are individuals with a disability as defined under the ADA. 42 U.S.C. § 12102(2).

200.     Defendant owns, leases, and/or operates a place of public accommodation as defined under Title III of the ADA. 42 U.S.C. § 12181(7)(D).

201.     Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

202.     Title III of the ADA defines discrimination to include denying participation or

offering unequal or separate benefit to individuals with disabilities. 42 U.S.C. § 12182(b)(1)(A).

203.    Title III of the ADA further defines discrimination to include "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services . . . ." 42 U.S.C. § 12182(b)(2)(A)(iii).

204.    Title III of the ADA further provides that "[i]t shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E).

205.    Pursuant to the DOJ implementing regulations for Title III of the ADA, when a public accommodation provides VRI service, it must ensure that the service includes all the following criteria: "(1) [r]eal-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) [a] sharply delineated image that is large enough to display the interpreter´s face, arms, hands, and fingers, and the participating individual´s face, arms, hands, and fingers, regardless of his or her body position; (3) [a] clear, audible transmission of voices; and (4) [a]dequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI." 28 C.F.R. § 36.303(f).

206.    Defendant discriminated against the individual Plaintiffs on the basis of their disabilities by: (1) denying Plaintiffs an equal opportunity to participate in and benefit from Defendant's goods, services, facilities, privileges, advantages, and/or accommodations, in violation of 42 U.S.C. § 12182(b)(1)(A); (2) failing to ensure effective communication through

the provision of on-site qualified sign language   interpreters, in violation of 42 U.S.C. § 12182(b)(2)(A); and (3) excluding or otherwise denying equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to Plaintiffs or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association, in violation of 42 U.S.C. § 12182(b)(1)(E).

207.    As set out above, absent injunctive relief there is a clear risk that Defendant's actions will recur with Plaintiffs and/or additional deaf persons.

208.    Plaintiffs are therefore entitled to injunctive relief, as well as an award of attorney's fees, costs, and disbursements pursuant to the ADA, 42 U.S.C. § 12188(a)(1) and/or common law.

## COUNT II: VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT

209.    Plaintiffs repeat and reallege all preceding paragraphs in support of this claim.

210.    At all times relevant to this action, Section 504 of the Rehabilitation, 29 U.S.C. § 794 has been in full force and effect and has applied to the Defendant's conduct.

211.    At all times relevant to this action, the United States Department of Health and Human Services ("HHS") regulations implementing Section 504 of the Rehabilitation Act, 45 C.F.R. Part 84, were in full force and effect and applied to the Defendant's conduct.

212.    At all times relevant to this action, Plaintiffs have had substantial limitation to the major life activities of hearing and speaking, and have been individuals with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9).

213.    At all times relevant to this action, Defendant has been a program or activity receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

214.    Pursuant to Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

215.    Defendant discriminated against Plaintiffs solely on the basis of their disability by denying them meaningful access to the services, programs, and benefits the Defendant offers to other individuals, and by refusing to provide auxiliary aids and services necessary to ensure effective communication, in violation of 29 U.S.C. § 794.

216.    As set out above, absent injunctive relief there is a clear risk that Defendant's actions will recur with Plaintiffs or other deaf patients.

217.    Plaintiffs are therefore entitled to seek and recover compensatory damages, for the injuries and loss they sustained as a result of Defendant's discriminatory conduct and deliberate indifference as hereinbefore alleged, pursuant to 29 U.S.C. § 794(a).

218.    Plaintiffs are further entitled to an award of attorney's fees, costs, and disbursements pursuant to the Rehabilitation Act, 29 U.S.C. § 794(a) and/or common law.

## COUNT III: VIOLATIONS OF THE NEW YORK HUMAN RIGHTS LAW

219.    Plaintiffs repeat and reallege all preceding paragraphs in support of this claim.

220.    At all times relevant to this action, the New York State Human Rights Law, Article 15 of the N.Y. Executive Law §§ 290, et seq. has been in full force and effect and has applied to Defendant's conduct.

221.    At all times relevant to this action, Plaintiffs have had substantial impairments to the  major life activities of hearing and speaking and are qualified individuals with a disability within the meaning of New York Executive Law § 292(21).

222.    At all times relevant to this action, Defendant's facilities have been places of public accommodation within the meaning of New York Executive Law § 292(9).

223.    Pursuant to New York Executive Law § 296(2)(a), "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, because of the … disability ... of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof ... to the effect that any of the accommodations, advantages, facilities and privileges of any such place hall be refused, withheld from or denied to any person on account of ... disability... or that the patronage or custom threat of any person of or purporting to ... having a disability is unwelcome, objectionable or not acceptable, desired or solicited."

224.    Pursuant to N.Y. Exec. L. § 296(2)(c), discrimination includes "refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities."

225.    Defendant discriminated against the individual Plaintiffs by withholding the accommodations, advantages, facilities or privileges of Defendant's place of public accommodation, in violation of N.Y. Exec. L. § 296(2)(a), and by failing to effectively accommodate Plaintiffs' disability in violation of N.Y. Exec. L. § 296(2)(c).

226.    Defendant further discriminated against Plaintiffs by failing to ensure effective communication through an onsite interpreter.

227.    As set out above, absent injunctive relief there is a clear risk that Defendant's actions will recur with Plaintiffs or other deaf patients.

228.    Plaintiffs are therefore entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of Defendant's discriminatory conduct as hereinbefore

alleged pursuant to N.Y. Exec. L. § 297(9).

## COUNT IV: VIOLATIONS OF THE NEW YORK CITY HUMAN RIGHTS LAW

229.    Plaintiffs repeat and reallege all preceding paragraphs in support of this claim.

230.    At all times relevant to this action, the New York City Human Rights Law ("NYCHRL") N.Y.C. Admin. Code §§ 8-101 et. seq., has been in full force and effect and has applied to Defendant's conduct.

231.    At all times relevant to this action, Plaintiffs have had substantial impairment to a major life activities of hearing and speaking and are qualified individuals with a disability within the meaning of N.Y.C. Admin. Code § 8-102(16).

232.    At all times relevant to this action, Defendant's facilities have been a places of public accommodation within the meaning of N.Y.C. Admin. Code § 8-102(9).

233.    Under the NYCHRL, places of public accommodation are required to make reasonable accommodations for persons with disabilities, and may not "refuse, withhold from or deny to such [disabled] person any of the accommodations, advantages, facilities or privileges thereof."  N.Y.C. Admin. Code § 8-107(4)(a).

234.    Additionally, a place of public accommodation "shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15)(a).

235.    The NYCHRL also explicitly allows "associational discrimination" claims: "The provisions of this section set forth as unlawful discriminatory practices shall be construed to prohibit such discrimination against a person because of the actual or perceived disability of a person with whom such person has a known relationship or association."  N.Y.C. Admin. Code §

8-107(20).

236.   In addition, Defendant retaliated against Plaintiffs for opposing discrimination in direct violation of N.Y.C. Admin. Code § 8-107(7), which provides in relevant part that "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has opposed any practice forbidden under this chapter."

237.   Defendant discriminated against Plaintiffs on the basis of their disability by withholding the accommodations, advantages, facilities or privileges of Defendant's medical services, in violation of N.Y.C. Admin. Code § 8-107(4), and by failing to effectively accommodate Plaintiff's disability in violation of N.Y.C. Admin. Code § 8-107(15)(a).

238.   As set out above, absent injunctive relief there is a clear risk that Defendant's actions will recur again with Plaintiffs and/or additional deaf patients.

239.   Plaintiffs are therefore entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of Defendant's discriminatory conduct as hereinbefore alleged pursuant to N.Y.C. Admin. Code § 8-502(a).

240.   Plaintiffs are further entitled to an award of punitive damages pursuant to N.Y.C. Admin. Code § 8-502(a).

241.   Plaintiffs are further entitled to an award of attorney's fees, costs, and disbursements pursuant to N.Y.C. Admin. Code § 8-502(g).

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully pray that this Court grant the following relief:

a.   Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendant's policies, procedures, and practices have subjected Plaintiffs to

unlawful discrimination in violation of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the New York Human Rights Law, and the New York City Human Rights Law;

    b.   Enjoin Defendant from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals meaningful access to and full and equal enjoyment of Defendant's facilities, services or programs;

    c.   Order Defendant:

        i.   to develop, implement, promulgate, and comply with a policy prohibiting future discrimination against Plaintiffs or other deaf or hard of hearing individuals by failing to provide effective communication;

        ii.   to develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an on-site interpreter for effective communication, one will be provided as soon as practicable in all services offered by Defendant;

        iii.   to develop, implement, promulgate, and comply with a policy to ensure that Defendant will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that Defendant will provide sign language interpreters, videophones, and other communication services to ensure effective communication with deaf or hard of hearing persons;

        iv.   to develop, implement, promulgate, and comply with a policy to ensure, in the event the Defendant utilizes a Video Remote Interpreting System ("VRI"), that such system has a high-speed Internet connection; a video

screen with appropriate size, position, capture angle, focus, and proximity to the deaf individual; and appropriate audio quality. When possible, the equipment should be portable and made available to the patient where the patient is located, preferably in a private room to minimize distractions and maintain confidentiality;

v.  to develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing patients are able to communicate through the most appropriate method under the circumstances, recognizing that the VRI is not appropriate in all medical situations;

vi.  to create and maintain a list of American Sign Language interpreters and ensure availability of such interpreters at any time of day or night;

vii.  to train all its employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ADA, Section 504 of the Rehabilitation Act, the New York Human Rights Law, and the New York City Human Rights Law;

viii.  to train all its employees, staff, and other agents on a regular basis about Defendant's policy regarding how to properly use VRI services (including how to set up the VRI system and how to obtain technical assistance in case of system malfunction or failure) and how to obtain interpreters when reasonably requested by deaf or hard of hearing patients;

d.  Award to Plaintiffs:

i.  Compensatory damages pursuant to Section 504 of the Rehabilitation Act, the New York Human Rights Law, and the New York City Human Rights

32

Law;

ii. Punitive damages pursuant to the New York City Human Rights Law;

iii. Reasonable costs and attorneys' fees pursuant to the ADA, Section 504 of the Rehabilitation Act, and the New York City Human Rights Law;

iv. Interest on all amounts at the highest rates and from the earliest dates allowed by law;

v. Any and all other relief that this Court finds necessary and appropriate.

## JURY DEMAND

Plaintiffs demand trial by jury for all of the issues a jury properly may decide, and for all of the requested relief that a jury may award.

EISENBERG & BAUM, LLP

By: _____

Eric M. Baum, Esq. (EB-5493)
ebaum@EandBlaw.com

_____

Andrew Rozynski, Esq. (AR-2870)
arozynski@EandBlaw.com

Attorneys for Plaintiffs
Office and Post Office Address
24 Union Square East, Fourth Floor
New York, NY  10003
(212) 353-8700