UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**NOT FOR PUBLICATION**

ANDREA L. VAN VORST, KENNETH
MAHNKEN, YVETTE SOTO, and
MARTIN J. WEINER,

Plaintiffs,

**MEMORANDUM & ORDER**

15–CV–1667 (ERK) (PK)

– against –

LUTHERAN HEALTHCARE d/b/a
LUTHERAN MEDICAL CENTER,

Defendant.

KORMAN, *J.*:

Andrea Van Vorst, Kenneth Mahnken, Yvette Soto, and Martin Weiner, each

of whom is deaf, filed suit against Lutheran Healthcare ("Lutheran") for its  alleged

failure to accommodate their disability in violation of (i) Title III of the Americans

With Disabilities Act; (ii) Section 504 of the Rehabilitation Act; (iii) the New York

State Human Rights Law; and (iv) the New York City Human Rights Law ("City

Law").  If Lutheran were liable under the City Law, it would entitle plaintiffs to all

the relief they sought.  On consent of the parties, only plaintiffs' cause of action

under the City Law was submitted to the jury, which found that Lutheran was not

liable.

1

The relevant language of the City Law provides that "it is an unlawful discriminatory practice" for a covered entity "not to provide a reasonable accommodation to enable a person with a disability to . . . enjoy the . . . rights in question. . . ."  N.Y.C. Admin. Code § 8–107(15).  Here, the protected right in question is the right to the "full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of a public accommodation."  *Id.* § 8–107(4)(1)(a).

After the jury returned its verdict for Lutheran and judgment was entered, Plaintiffs filed a timely motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 ("Rule 50") on the ground that "the evidence cannot support a verdict that [p]laintiffs could effectively communicate at every point of their medical care," and they "were treated 'less well' when they received over 70 consent forms in a secondary language—without the benefit of an American Sign Language interpreter."  Pl. Br. at 1.  In the alternative, plaintiffs move for a new trial pursuant to Fed R. Civ. P. 59 ("Rule 59") on the grounds that one sentence of the jury instruction, taken out of context, was erroneous and that the verdict was against the weight of the evidence.  *Id.* at 1–2.

## BACKGROUND

Each of the plaintiffs is deaf, and each received medical care at Lutheran on multiple occasions between 2012 and 2016.  During that period, Lutheran generally

2

relied on Video Remote Interpreting ("VRI"), a videoconferencing system, to allow off–site interpreters to interpret deaf patients' American Sign Language ("ASL")[1] into English for Lutheran personnel and the personnel's English into ASL for the deaf patients. The overall reliability of the VRI technology was disputed at trial, but the technology occasionally failed due to technical difficulties. When that occurred, plaintiffs communicated with their doctors and other Lutheran personnel in English through lipreading and by reading and writing notes. The principal focus of plaintiffs' motion turns on the process used to obtain their consent to medical procedures and whether they were capable of understanding information that was conveyed to them prior to signing consent forms.

Before addressing the plaintiffs' legal argument, an overview of the consent process at Lutheran and plaintiffs' ability to understand and read English is necessary. The evidence regarding the consent process was described by Marina Chilingarova, a former administrator at Lutheran, based on her own personal knowledge and experience. Chilingarova testified that usually the doctor or nurse practitioner who had direct contact with the patient would obtain the patient's informed consent and would explain the procedures, risks, and benefits to the

---

[1] ASL is "the primary language of many North Americans who are deaf and is one of several communication options used by people who are deaf or hard-of-hearing." *Noll v. Int'l. Bus. Mach. Corp*, 787 F.3d 89, 99 n.1 (2d Cir. 2015) (Sack, J. dissenting) (citation omitted). It is a language that "employs signs made by moving the hands combined with facial expressions and postures of the body." *Id.*

patient.  Trial Tr. at 742:11–15.  If the patient had limited English proficiency, that explanation would be provided through an interpreter.  *Id.* at 742:16–19.  The interpreter would "be interpreting the words of the provider" and not "every single word" on the consent form.  *Id.* at 673:6-15.  Then it would be up to the doctor to determine whether or not the patient understood the procedure.  *Id.* at 742:24–743:2.  Usually, for deaf patients, the "interpreting of the risks and benefits [of a procedure] would happen . . . through video remote interpreting."  *Id.* at 743:20–25.  Then, "after that process . . . the patient would be asked to actually sign the informed consent form."  *Id.* at 744:5–8.  Certain consent forms, such as "Consent for Administration of Blood or Blood Components" and "Permission for Operation and/or Procedure and Anesthesia," ask physicians at Lutheran to certify that they "have explained to the consenting party, the nature, purpose, benefits, risks of, and alternatives to" to the proposed procedures.  Indeed, there are numerous examples in the consent forms that plaintiffs attached to their motion where doctors made such certifications even though the forms were not signed by an interpreter or translator.  *See, e.g.*, ECF No. 109–1 at 1, 13–15, 16, 18–19; ECF No. 109–2 at 3–4, 13–14, 16–17, 30–32; ECF No. 109–3 at 2; ECF No. 109–4 at 3–5.

Chilingarova testified that she was also "part of the training that . . . would encourage providers to" ask patients to "repeat whatever the plan [was] just to make sure that [patients] really understood and that the interpretation was correct," a

4

process known as "teachback."  Trial Tr. at 743:2–9.  Chilingarova "encourage[ed] providers to [engage in teachback] when [seeking] informed consent [from] patients who may be deaf [or] had limited English proficiency[,] just to be sure that they understood the interpretation."  *Id* at 743:10–14.

Of the approximately 150 languages spoken by patients of Lutheran, consent forms were only available in the five languages most spoken by patients—English (which, from the evidence described below, a jury could have reasonably concluded plaintiffs understood), Spanish, Chinese, Russian, and Arabic.  Trial Tr. at 680:10–684:9.  For those patients who could only read other languages, an interpreter would be made available "just to give the essence of what the form was saying."  Trial Tr. at 673:6–15.  Chilingarova testified that all interpreters, regardless of language, including ASL interpreters who interpreted over VRI, were instructed not to interpret verbatim every single word on a consent form.  *Id.*

Because of its importance to plaintiffs' motions, I set forth in some detail the evidence at trial that demonstrated each plaintiff's ability to understand and communicate with their physicians in English and provide informed consent to medical procedures at Lutheran.  I add this brief preface.  Plaintiffs' consent forms were admitted as part of a document dump of their medical records.  A review of the trial record shows that only three plaintiffs—Weiner, Van Vorst, and Mahnken—testified about their understanding of four consent forms out of the 70 on which the

5

plaintiffs' motions are based.  Soto was not asked about signing any consent forms.

Although they testified about signing other forms, plaintiffs were not asked whether

they understood those forms or why they would sign those forms without

understanding them.  The omission of this testimony is puzzling in light of my charge

to the jury on damages, which plaintiffs requested, that it must "decide the issue of

damages separately as to each plaintiff."  ECF No. 88 at 15 (emphasis in original).

I only discuss here the four forms to which Weiner, Van Vorst, and Mahnken

testified about their understanding, preceded by the evidence regarding their

understanding of English and ability to communicate in that language by reading,

writing, and lipreading.

**Martin Weiner**:  Neither Weiner's parents nor his brother knew ASL and

Weiner communicated with them by writing on paper.  Trial Tr. at 576:25–577:4.

As with all the other plaintiffs, when Weiner went to school, his classes were taught

in English and not ASL.  *Id.* at 577:5–12.  Weiner enjoys reading about politics and

sports in the New York Post, reads magazines about model airplanes, and watches

television with closed captions "almost every day."  *Id.* at 580:14–581:12.  He also

worked as a printer, which required him to read backwards in order to set type.  *Id.*

at 577:13–578:4.

Despite Weiner's testimony that he only understands "very simple" English

words, *id.* at 554:23–25, and what turned out to be the less than credible testimony

6

of plaintiffs' expert, Judy Shepard–Kegl, that he only has a third–to–fourth–grade English reading level, *id.* at 186:7–18, Weiner was able to read the 106–page transcript of his deposition in this case, complete a detailed errata sheet, and make substantive comments about his testimony.  Among the many changes Weiner made that indicated his ability to read and understand English included correcting the transcript to indicate that a person he was speaking about was a "deputy VP," as opposed to an "assistant vice president," and that the phrase "be restless" should be used instead of "probably go mad."   *Id.* at 651:10–17.   He also corrected the improper usage of the homophones "sun" and "son."   *Id.* at 651:23–652:2. Moreover, in a separate note attached to his deposition transcript, Weiner provided explanations for some of his deposition testimony that he wanted to clarify but could not include on the errata sheet because they were substantive comments instead of line edits.  ECF No. 51–9 at 108.  As he explained in a note written in his own hand: "I can't put them down on errata sheet because there are errors and corrections on errata sheet only."   *Id.*   This note and errata sheet were used to impeach Weiner, which devasted his credibility and the credibility of plaintiffs' expert who testified that each of the plaintiffs had between a first and fourth grade reading level.  Trial Tr. at 644–45, 647–53.  The jury requested Weiner's deposition errata sheet during deliberations.  *Id.* at 1185:4–12.

7

Plaintiffs' attorney did not show Weiner any consent forms during direct examination.  On cross examination, Weiner claimed that he signed a consent form for a toenail removal procedure without understanding its contents.  *Id.* at 625:17–626:2.  Yet Weiner had testified at his deposition that a nurse named Stephanie communicated with him in ASL to explain that his toenail was going to be removed.  *Id.* at 624:4–12.  When confronted with this testimony, Weiner said that he did not remember so testifying and claimed that he did not understand "five percent" of his deposition testimony when he read it, which was unlikely given the corrections and written comments he made with respect to the deposition transcript described above.  *Id.* at 624:15–17.  After testifying on cross that he did not remember whether a nurse communicated with him in ASL prior to his signing the consent form, Weiner changed his story and admitted that a nurse wrote down on a piece of paper "Remove Nail" to which he responded "Ok, I consent to that."  *Id.* at 623:16–22.

In addition to this consent form, Weiner testified that he signed discharge papers without an interpreter present after being prescribed an antibiotic at the emergency room for a urinary tract infection.  *Id.* at 568:1–5.  He claimed that ten days after his discharge he was still in pain and went to another hospital for treatment.  *Id.* at 568:6–11. Weiner testified that his doctor at Lutheran never explained to him what he should do if his condition did not improve.  *Id.* at 569:3–11.  On cross-examination, Weiner was confronted with the discharge papers he

8

signed, which recommended that he follow up with his primary physician within two days and instructed him to return to the emergency room if his symptoms worsened. *Id.* at 581:16–583:10.  Weiner responded that  Lutheran "gave [him] lots of paper, and [he] just . . . signed without the understanding of what was being said"  because he was "not able to read it all."  *Id.* at 583:11–13.

**Andrea Van Vorst:**  When Van Vorst was in public elementary school up through eighth or ninth grade, her teachers did not teach her in ASL.  Trial Tr. at 79:11–80:7.  Rather, she learned to read lips and to read and write in English.  *Id.* at 79:19–80:3.  Her parents and brother never learned ASL, and she communicated with them by writing in English.  *Id.* at 80:8–80:15.  When she started her career as an encoder at a bank, Van Vorst was never provided with an ASL interpreter, and she communicated with her boss through lipreading and writing in English.  *Id.* at 80:18–81:25.  In 2016, Van Vorst had a home health aide who did not know ASL and who communicated with her by writing back and forth in English.  *Id.* at 82:3–21.  Van Vorst watches television and reads the closed captions in English.  *Id.* at 85:10–15.  She has her driver's license and passed a written test—in English—to get her permit.  *Id.* 85:16–24.

Several of Van Vorst's doctors testified that they have been able to communicate with her for years without the use of an ASL interpreter.  *Id.* at 234–38, 781–82, 795–96.  Van Vorst's primary care physician, Dr. Tavrovskaya, testified

that she and Van Vorst occasionally communicated with one another via handwriting when VRI was not working. *Id.* at 234:4–238:23. Indeed, by writing in English, Van Vorst was able to inform Dr. Tavrovskaya that she had been seeing a social worker for depression and responded to Dr. Tavrovskaya's questions about her depression such as whether she was feeling sad, had problems concentrating, lost weight, or had a healthy appetite. *Id.* at 235:17–236:6. Van Vorst's social worker, who counseled her at Lutheran, corroborated Dr. Tavrovskaya's testimony about Van Vorst's treatment for depression and testified that she was able to use VRI to effectively communicate with Van Vorst without ever experiencing technical difficulties. *Id.* at 858:4–868:8, 873:4–7.

Van Vorst's gastroenterologist, who worked part time at Lutheran and part time in private practice, began treating Van Vorst in 2011. *Id.* at 534:4–535:7. He testified that Van Vorst declined interpretive services and communicated with him through lip reading and writing. *Id.* at 498:11–15. He also testified that she never complained about his treatment of her and expressed gratitude for the care that he was providing. *Id.* at 535:13–17.

Van Vorst's surgeon, who was in private practice when he began treating Van Vorst in the 1990s and whom Van Vorst credited with saving her life, testified that in his decades treating her, she never asked for an interpreter and she never told him that she didn't understand him. *Id.* at 126:20–23; 781:21–783:11. Van Vorst even

10

wrote a note to her primary care physician praising her surgeon's services, which read: "Yesterday I saw Dr. Shahin. Very good to me.  I know him for many years. Start 18 years old.  Still now." *Id.* at 1045:18–1046:11.

Van Vorst's podiatrist, Dr. Lucido, who also began treating her when he was in private practice, testified that in the more than ten years and over 240 visits that she was his patient, Van Vorst never asked for an ASL interpreter. Dr. Lucido explained how he communicated with Van Vorst.  Specifically, he had a dry erase board in his treatment room, which had diagrams of the foot and ankle, and he would draw pictures to explain pathology and treatment.  If she had any questions, Van Vorst would communicate with Dr. Lucido, and he with her, by writing back and forth to each other on a notepad.  *Id.* at 795:1–797:10.

Van Vorst testified about signing two consent forms without understanding their contents.  The first consent form related to removal of her gallbladder.  Van Vorst testified that she was unaware that her doctors had told her that she needed gallbladder surgery and did not know that her gallbladder was removed until her deposition in this case.  *Id.* at 64:17–68:15, 140:6–141:17.  She also testified that she had no marks on her body related to her gallbladder being removed, but had several marks related to hernias.  *Id.* at 64:23–65:2.  Yet the Complaint in this case, which was filed before Van Vorst was deposed and a portion of which was read to the jury, specifically alleges that she underwent "open cholecystectomy surgery"—the

medical term for gallbladder removal.  *Id.* at 816:22–817:9.  And the surgeon who performed the procedure testified that he performed open gallbladder surgery, as opposed to a laparoscopic removal, which left a four-to-five inch scar under her rib. *Id.* at 786:1–22.  Van Vorst's gastroenterologist testified that he recommended to her that she consult with a surgeon about possibly removing her gallbladder and stated that Van Vorst indicated to him that she understood what he was recommending.  *Id.* at 497:16–501:14.  Indeed, she went to see the surgeon her gastroenterologist recommended who testified that he explained to her that she needed to have her gallbladder removed, and he had Van Vorst repeat back to him what he was telling her to make sure that she understood.  *Id.* at 780:7–783:11.  Her surgeon was also present at Lutheran when Van Vorst signed the consent form for her gallbladder surgery, and he testified that he made sure she understood the consequences of the surgery before she signed the form.  *Id.* at 784:3–785:23.  The surgeon certified on the consent form Van Vorst signed that he "explained . . . the nature, purpose, benefits, risks of, and alternatives to" the gallbladder surgery to her. ECF No. 109–1 at 18.

The second consent form that Van Vorst claimed to have signed without understanding related to a procedure on her foot.  Specifically, Van Vorst had a severe infection and was told by her podiatrist, Dr. Lucido, to go to the emergency room because she needed antibiotics administered intravenously and to have dead

tissue surgically removed from her foot. She claimed that she left Lutheran prior to the surgery being performed, after someone on Lutheran's staff allegedly made a sawing motion, which she claimed to have understood to mean that her doctor was going to amputate her foot. Trial Tr. at 70:19–74:22. Despite Van Vorst's testimony that she believed her foot was going to be amputated during surgery, Dr. Lucido, with whom she had consulted on more than 240 occasions without requesting an interpreter, testified that he informed her about the nature and consequences of the procedure in his office and again at Lutheran and that Van Vorst indicated that she understood him based on her responses to his explanation. *Id.* at 796:4–800:3. Subsequently at Lutheran, "during the signing of the consent form [Van Vorst] didn't like the language that [was] used to explain risks and alternatives of the surgery and she didn't want to sign the consent and she left." *Id.* at 799:17–20. Specifically, she did not like the fact that one of the possible risks of surgery was loss of limb. *Id.* at 799:22–800:2. A couple days later, Van Vorst visited Dr. Lucido's office, where he was able to successfully perform the procedure on her foot because the antibiotic I.V. she received at Lutheran improved her overall condition, so that he could perform the surgery outside the hospital. *Id.* at 800:5–11. Van Vorst was evasive when asked questions about whether Dr. Lucido had recommended that she go to Lutheran for the operation on her foot and whether Dr. Lucido had successfully performed the operation in his office after she left the hospital. *Id.* at

13

75:9–76:13, 132:3-133:20.    Van Vorst's equivocation and asserted failure to remember raised significant issues related to her credibility and provided a reasonable basis for the jury to conclude that she did not undergo the procedure precisely because she understood the risks of surgery.

**Kenneth Mahnken:** Every month when he visits his primary physician, who is not affiliated with Lutheran, Mahnken communicates with her without an ASL interpreter by reading her lips.  *Id.* at 344:24–346:16.  Mahnken reads magazines and newspapers and testified at a deposition that he can read the New York Post "pretty good."  *Id.* at 307:5–14, 344:21–23.  He also watches history and true crime shows on television with closed captions.  *Id.* at 307:15–21.   Mahnken communicates with his parents, siblings, and uncle primarily through lipreading and writing.  *Id.* at 321:1–25.  His ex-girlfriend, whom he also described as his best friend and who sometimes accompanied him on his visits to Lutheran, does not speak ASL, and he communicated with her through lipreading.  *Id.* at 322:8-22.  Mahnken also uses email to communicate with people and orders items online through eBay.  *Id.* at 344:2–7.  When he worked at a radiator store, none of Mahnken's co-workers were deaf, and he communicated with them through lipreading.  *Id.* at 323:20–324:3.

Mahnken testified about signing one consent form without understanding its contents.   Plaintiffs' counsel showed him a consent form for a kidney stone procedure that a Dr. Calciano performed on him on August 23, 2012.  The form was

14

unsigned by an interpreter, and Mahnken testified that, when he signed it, he did not understand its contents.   Trial Tr. at 318:1–320:1.   But, on cross examination, defense counsel showed Mahnken a consent form for the same exact procedure, which indicated that ASL interpretive services were provided.  *Id.* at 338:1–14.  And Mahnken admitted that he believed there was someone from the office who communicated with him in ASL after defense counsel confronted him with that version of the consent form.  *Id.* at 342:6–23. Another troubling aspect of this case occurred when I noticed Weiner communicating with Mahnken in sign language as he testified.  When I noticed this, plaintiffs' counsel was directed to instruct their clients not to communicate with witnesses while they were on the stand.  *Id.* at 340:2–341:2.

**Yvette Soto:**   Neither Soto's parents nor her siblings understand ASL, and she communicates with them through gestures.  *Id.* at 405:14–406:7.  Soto has held a number of jobs where she was required to communicate with people who did not understand ASL and she likewise communicated with them through gestures.  *Id.* at 415:6–417:4.  One of her jobs was at a library, which required her to alphabetize books.  *Id.* at 416:11–13.  Soto's primary care physician testified that he has communicated with her through writing and that she confirmed her understanding of what he told her by responding appropriately to his questions.  *Id.* at 478:21–479:6, 480:20–481:10, 482:16–483:14.   Soto did not testify about whether she

15

understood any of the consent forms that she signed and which were admitted into evidence as part of a document dump of medical records.

***

Against this backdrop I turn to the legal issues raised by plaintiffs' motions under Rule 50 for a judgment notwithstanding a verdict and for a new trial under Rule 59.

**ANALYSIS**

**A.**   **<u>Rule 50 Motion</u>**

Under Rule 50, "[a] judgment notwithstanding the verdict may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112 (2d Cir. 2015) (internal quotation and alteration omitted). The moving party bears a heavy burden, especially where, as here, "the jury has deliberated in the case and actually returned its verdict in favor of the non–movant." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation omitted).

Plaintiffs' motion for judgment notwithstanding the verdict is based on the single ground that they were treated "less well" than other patients. Pl. Br. at 8–9. This claim fails for numerous reasons. First, the less well standard on which they

16

rely is based on a Guidance issued by the New York City Commission on Human Rights in 2018, years after they were treated at Lutheran.[2]  Pl. Br. at 9 (citing N.Y.C. Commission on Human Rights, *Legal Enforcement Guidance on Discrimination on the Basis of Disability*) (hereinafter the "Guidance").  Such Guidance would have lacked the force of law even if it was in effect during the relevant period.  *See Suffolk Reg'l Off-Track Betting Corp. v. N.Y. Racing & Wagering Bd.*, 11 N.Y.3d 559, 571–72 (2008).  More significantly, even if the Guidance was treated as the equivalent of a statute, it could not be applied retroactively as a basis for imposing legal liability on Lutheran (as distinguished from prospectively).  Nor could other portions of the Guidance first adopted in 2018 upon which plaintiffs rely, *see* Guidance at 64–65, be so applied.  Indeed, both the Supreme Court and the New York Court of Appeals have held that a predicate for such retroactive application of a legislative enactment depends on a clear indication of legislative intent that it be so applied.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 268 (1994); *Matter of Regina Metro. Co., LLC v. N.Y. State Div. of Hous. & Cmty. Renewal, No.*, 35 N.Y.3d 332, 365–69 (2020) (applying holding in *Landgraf*).  And this is particularly true where, as here, the

---

[2] After the parties submitted their briefing for the present motion, I asked them to advise me of the date when the Guidance was first issued because I had trouble obtaining that information.  It is undisputed that the first version of the Guidance was issued in June 2018.  *See* ECF Nos. 122, 123.  *See also* Susan Gross Sholinsky & Nancy L. Gunzenhauser Popper, *NYC Commission on Human Rights Issues Guidance on Employers' Obligations Under the City's Disability Discrimination Laws*, Nat'l L. Rev. (Sept. 17, 2018).

plaintiff seeks punitive damages predicated on the retroactive application of the Guidance. *See Landgraf*, 511 U.S. at 281; *Regina Metro. Co.*, 35 N.Y.3d at 384–85.

Nevertheless, unaware of the effective date of the Guidance, and over the objection of Lutheran, I gave the jury the following instruction:

> [Lutheran] was required to make reasonable accommodations to enable disabled persons to enjoy the benefits that [Lutheran] normally makes available to its patients. [Lutheran] discriminated against a plaintiff if, because of a plaintiff's disability, [Lutheran], either directly or indirectly, treated the plaintiff less well by not providing him or her with any appropriate auxiliary aids and services that *were necessary to ensure that he or she could effectively communicate with [Lutheran's] physicians and staff in order to participate in his or her medical care.*

Trial Tr. at 1122:5–14 (emphasis added).

The jury's verdict indicated that it found that Lutheran made reasonable accommodations to enable plaintiffs to enjoy the benefits that it normally made available to its patients and that they were provided with appropriate aids and services that were necessary to ensure that they could effectively communicate with Lutheran's physicians and staff in order to participate in their medical care. Nevertheless, plaintiffs argue that, even if the auxiliary services that were provided enabled them to effectively communicate with Lutheran's physicians and staff in order to participate in their medical care, they were treated less well when they received "over 70 consent forms in a secondary language [English]—without the benefit of an ASL interpreter." Pl. Br. at 10. Specifically, they argue that "[e]ven if

the jury disagreed with expert testimony outlining plaintiffs' abilities in English, nothing in the record supports the proposition that plaintiffs' fluency in English surpassed their fluency in ASL." *Id.*

Passing over the fact that the jury was not required to give credence to plaintiffs' testimony or that of their retained expert, who simply accepted what plaintiffs told her, this argument is flatly inconsistent with the less well standard as outlined in my instruction, which is based on the language of the City Law and plaintiffs' own request to charge. *See* N.Y.C. Admin Code § 8-107(15); ECF No. 68 at 9. The issue for the jury to decide was not whether plaintiffs' abilities in English surpassed their fluency in ASL. The critical issue is whether plaintiffs' ability to read, understand, and write English enabled them "to effectively communicate with Lutheran's physicians and staff in order to participate in his or her medical care." There was more than enough evidence that the jury could so find. Indeed, a note sent by the jury during deliberations indicates that it focused on this instruction. The note read as follows:

> The jury requests some clarification on the instructions you gave to us. On page 11, starting on line 4, which says: "The hospital discriminated against a plaintiff if, because of the plaintiff's disability, the Hospital either directly or indirectly, treated the plaintiff less well by not providing him or her with any appropriate auxiliary aids and services that were necessary to ensure that he or she could effective [*sic*] communicate . . ."[3]

---

[3] The reason the jury was able to quote from my instruction is because it is my practice to provide a copy of the instruction to each juror.

We are struggling with the definition of "effectively communicate."

On page 12, line 7 & 8 says "Ensuring effective communications is a legal requirement."

Does "effective communication" need to be done in the native or preferred language?  For example, means of communication could be writing notes, VRI, gesturing, or American Sign Language live in person interpreter.  For different languages, one or the other means would be appropriate.  A native German speaker for example, would never use VRI or ASL interpreter.  For the plaintiffs, each of which has a varying level of English proficiency, would it be appropriate to consider note writing as an "effective means" of communications?

ECF No. 89–5.

The answer I gave to this direct question was that "it could, depending on the circumstances."  ECF No. 89–6.  Indeed, it was plaintiffs' counsel who suggested I provide the jury with that answer, Trial Tr. at 1152:8–1153:9, thus reflecting their understanding that whether plaintiffs were provided an equally effective means of communication is a fact-intensive inquiry unsuited for judgment as a matter of law.  Plaintiffs' counsel conceded as much during a sidebar at trial: "So whether [Weiner] got effective communication is a highly disputed issue for the jury to decide."  *Id.* at 642:12–14; *see also Noll v. Int'l. Bus. Mach. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015).

Separate and apart from this issue, plaintiffs argue for the first time in their reply brief that they were treated less well because "other patients do not receive consent forms in a secondary language."  Reply Br. at 12.  Passing over the fact that ASL cannot be provided in written form, plaintiffs' contention is not supported by

20

the record.  As described above, Chilingarova testified that the consent forms were only available in five languages English, Spanish, Chinese, Russian, and Arabic. Trial Tr. at 680:10–25.  For those who could only read other languages, an interpreter would be made available "just to give the essence of what the form was saying." *Id.* at 673:8–9.  Plaintiffs were not treated any differently—let alone "less well"—than hearing patients who spoke any other language.  None of Lutheran's patients—deaf or hearing—had written translations of the consent forms made available to them unless they read and understood one of the five languages.[4]  "For sign language, if the patient reads English, they will get a written version." *Id.* at 682:11–12.

Indeed, the language of the consent forms upon which plaintiffs rely, and which they characterize as the "operative phrase," provides that "*If* consenting party is unable to read or unable to understand English," an interpreter will certify that he or she has read or interpreted the contents of the consent form to the patient in the

---

[4] Plaintiffs also mischaracterize Chilingarova's testimony when they argue that she "explained that VRI should not be used to sign consent forms."  Pl. Br. at 5.  As described above, Chilingarova testified that all interpreters, regardless of language, were instructed not to interpret verbatim every single word on a consent form because they were interpreters of spoken language, not translators of written language. Trial Tr. at 682–83.   Chilingarova thus simply testified that VRI interpreters—just like any interpreter used by Lutheran—should not translate consent forms verbatim.  She never testified that it was inappropriate to use VRI to facilitate effective communication between deaf patients and their doctors to obtain informed consent for a procedure.

presence of a physician.  Pl. Br. at 4; Exs. A–D (emphasis added).[5]  Based on the evidence described above, the jury could have concluded that each of the plaintiffs did, in fact, read and understand English and could also write in English.  In sum, plaintiffs' argument in support of their motion for a judgment notwithstanding the verdict is legally and factually without merit.

Perhaps recognizing the flaw in the only argument made in their opening brief for judgment as a matter of law, plaintiffs' reply brief contained arguments not made in their initial memorandum.  Specifically, they argued that (1) "under Federal law" they are "entitled to auxiliary aids and services to achieve equally effective communication";  (2) New York City law is "broader than federal law," and that under the City Law plaintiffs were entitled to reasonable accommodations unless that accommodation imposes an "undue hardship"; and (3) reformulated and now relegated to last place in the order of arguments made on reply, the "less well" standard entitles them to judgment as a matter of law.  Reply Br. at 4–13.  I decline to consider the first two new arguments for judgment as a matter of law because they were made for the first time in plaintiffs' reply brief.  *See Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n.5 (2d Cir. 2006) (Sotomayor, *J.*); *United States v. Yousef*, 327

---

[5] On the second day of trial, before I had a full understanding of the case and the evidence that would be presented, I said that "I agree that [plaintiffs] need an ASL interpreter" to "sign a valid consent form." Pl. Br. at 11.  The issue turned out to be much more complicated than that, as my jury instructions indicate.

F.3d 56, 115 (2d Cir. 2003); *Aviva Trucking Special Lines v. Ashe*, 400 F.Supp.3d 76, 80 (S.D.N.Y. 2019) (Koeltl, *J.*). I make an exception for plaintiffs' "less well" argument because it bears some relation to the argument in their opening brief, which I have addressed above.

While the other two arguments that plaintiffs make for the first time in their reply memorandum cannot provide a basis for a motion for judgment as a matter of law, plaintiffs make similar arguments with respect to their motion for a new trial pursuant to Rule 59 on the ground that the jury instructions are erroneous. I reject them below because they do not provide a basis for that relief, in part because their objection to the charge, which they requested, was procedurally forfeited.

**B.**   **Rule 59 Motion**

Under Rule 59, a district court may award a new trial if, as relevant to plaintiffs' motion, (1) the jury instructions contained prejudicial errors or (2) the jury reached a verdict that is against the weight of the evidence. *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012); *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 91 (2d Cir. 2002).

**1. Jury Instructions**

In reviewing plaintiffs' challenge to the jury instructions, the instructions must be considered "in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law." *United*

*States v. Weintraub*, 273 F.3d 139, 151 (2d Cir. 2001).   A jury instruction is erroneous if, "in light of the charge as a whole," it "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Callahan v. Wilson*, 863 F.3d 144, 148 (2d Cir. 2017) (internal quotation omitted).   "An erroneous instruction, unless harmless, requires a new trial." *Jin*, 310 F.3d at 91. An erroneous jury instruction is harmless where "the court is convinced that the error did not influence the jury's verdict." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000).

Plaintiffs argue that it was error to instruct the jury that Lutheran "was not required to provide the plaintiffs with the . . . plaintiffs' preferred means of communication."  Pl. Br. at 12.  Some background as to the language of the clause to which plaintiffs object is necessary.  Plaintiffs did not submit a proposed jury instruction on this issue.  An early version of the instructions that I circulated contained the following language:

> Whether [Lutheran] discriminated against a plaintiff under these laws does not depend on the health outcome resulting from the plaintiff's medical treatment, nor on whether the plaintiff would have experienced a better health outcome if he or she were not disabled.  These laws also did not require [Lutheran] to provide the plaintiffs with the best possible means of communication, nor the most efficient means of communication, nor the plaintiffs' preferred means of communication.[6]

---

[6] The first draft of my instructions that was provided to the parties was not marked as a court exhibit.  The language quoted above comes from my chambers copy, which will be docketed along with this opinion.

Plaintiffs objected to the clause in the sentence that Lutheran was not required to provide the plaintiffs' "preferred means of communication."  Trial Tr. at 906:19–907:12.  After some colloquy, plaintiffs' counsel, Mr. Rozynski, suggested that I use the instruction given in *Giterman v. Pocono Med. Ctr.*, ECF No. 168, 3:16–cv–0402 (M.D. Pa. 2019).  And specifically, he quoted language in the *Giterman* charge which stated in relevant part that "[t]here is no per se rule that sign language interpreters are always mandated or are required upon request."  Trial Tr. at 904:2–4.  Mr. Rozynski concluded by stating that if the *Giterman* instruction was given it would "alleviate[] everyone's concerns here."  *Id*. at 904:2–905:8.  After a recess, I circulated another draft of my instruction (Court Exhibit 4), which included the language from my earlier draft and added the full language from *Giterman* over defendant's objection.  *Id.* at 947:10–948:4.  The revised charge (with the *Giterman* language italicized and bolded below) was included in the final charge (Court Exhibit 7) and ultimately read as follows:

> Whether [Lutheran] discriminated against a plaintiff does not depend on the health outcome resulting from the plaintiff's medical treatment, nor on whether the plaintiff would have experienced a better health outcome if he or she were not disabled.   [Lutheran] was not required to provide the plaintiffs with the best possible means of communication, nor the most efficient means of communication, nor the plaintiffs' preferred means of communication. Rather, [Lutheran] was required to provide the plaintiffs with equal access to and participation in their own medical treatment.  Stated another way, in order for aids, benefits, or services to be equally effective, they are not

required to produce the identical result or level of achievement for disabled and nondisabled persons, but must afford disabled persons the *opportunity* to obtain the same result, to gain the same benefits or to reach the same level of achievement.

Now, on Monday during the course of the trial, I told you that [Lutheran] had to provide VRI that works.  This was not an entirely accurate statement.  Ensuring effective communication is the legal requirement—VRI is only one way to ensure effective communication, provided that it functions properly.

***There is no* per se *rule that sign language interpreters are always mandated or are required upon request. Nor does the law require healthcare providers to supply any and all auxiliary aids even if they are desired and demanded. The law provides that the type of auxiliary aids will vary depending upon the circumstances.***

***Specifically: the type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication used by the individual, and the context in which the communication is taking place.***

***So, for example, here is an illustration that is not itself a part of the law, and is not factually similar to the facts in this case:***

> ***Patient goes [to] his doctor for a bi–weekly check–up, during which the nurse records Patient's blood pressure and weight. Exchanging notes and using gestures are likely to provide an effective means of communication at this type of check–up. BUT: Upon experiencing symptoms of a mild stroke, Patient returns to his doctor for a thorough examination and battery of tests and requests tha[t] an interpreter be provided. Patient's doctor should arrange for the services of a qualified interpreter, as an interpreter is likely to be necessary for effective communication with the***

> **Patient, given the length and complexity of the communication involved.**[7]

ECF No. 88 at 11:14–13:12.

Notwithstanding the inclusion of this language from *Giterman*, which could not have been more helpful to plaintiffs, Mr. Roszynski again objected to the language that remained in the charge that Lutheran "was not required to provide plaintiffs with . . . plaintiffs' preferred means of communication. . . . [This is] the only thing that I have a problem with." Trial Tr. at 972:15–973:9. Just to be clear again, this language, which was located on page 11, line 11 of Court Exhibit 4, was the only language to which plaintiffs objected. *Id.* at 972:15–19. I rejected that objection because the phrase to which they objected was necessary to place in context the subsequent sentence, which was helpful to plaintiffs, and which reads as follow: "Rather [Lutheran] was required to provide the plaintiffs with equal access to and participation in their own medical treatment." ECF No. 87 at 11. The suggestion that this constitutes reversible error simply ignores the fact that there was no meaningful difference between the objectionable phrase and the *Giterman* instruction, including its first line that "[t]here is no *per se* rule that sign language

---

[7] The *Giterman* instruction explicitly says that this illustration is from a Technical Assistance Manual without describing its source. The manual was in fact published by the Department of Justice relating to compliance with Title III of the ADA. *See* Dep't of Justice, *Technical Assistance Manual on the American With Disabilities Act,* § III–4.3200.

interpreters are always mandated or are required upon request." Indeed, when requesting the *Giterman* instruction, plaintiffs' counsel acknowledged:

> So [the Court's proposed jury instruction] would incorporate the language that says the city law did not require the hospital to provide plaintiffs with the best possible means of communication, nor the most efficient means of communication or the plaintiffs preferred means of communication. Again, I think the language I just read off [from *Giterman*] **would subsume that**.

Trial Tr. at 906:25–907:6 (emphasis added).

Under these circumstances, plaintiffs' argument that the charge was prejudicial error fails for several reasons. First, because the inclusion of the *Giterman* charge that plaintiffs themselves requested repeated the language that they now claim was erroneous, their objection is procedurally forfeited. *See United States v. Kosinski*, 976 F.3d 135, 153 (2d Cir. 2020) (Where plaintiffs "appear[] to have endorsed the substance of the given charge," they "ha[ve] waived any right to . . . review of the charge.").

Second, notwithstanding the opening sentence of the *Giterman* instruction that "[t]here is no *per se* rule that sign language interpreters are always mandated or are required upon request," the subsequent illustration in the paragraph that followed explained that the "type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication used by the

individual, and the context in which the communication is taking place," and explicitly stated that there may be circumstances where a doctor may be required to "arrange for the services of a qualified interpreter" at the patient's request. Thus, the jury was told, and plaintiffs were permitted to argue, that there were circumstances in which a covered entity, such as Lutheran, may be required to provide sign language interpreters to deaf patients.

This significant mitigating language aside, the charge that plaintiffs object to was not erroneous. The Appellate Division has held that that the City Law does not obligate covered entities to provide disabled individuals the "specific accommodation" that they "prefer[]." *See Porter v. City of New York*, 128 A.D.3d 448, 449 (1st Dep't 2015); *Silver v. City of N.Y. Dep't of Homeless Servs.*, 115 A.D.3d 485, 486 (1st Dep't 2014) ("an employer is not obligated to provide the disabled employee with [an] accommodation that the employee requests or prefers"). These Appellate Division cases may not "be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940).

Rather than any hint that the Court of Appeals would reject these Appellate Division cases and hold that a covered entity must provide a disabled individual with his preferred means of communication, there is data which suggests these cases were decided correctly. Even the New York City Commission on Human Rights

Guidance on which plaintiffs rely, although rendered after plaintiffs were treated, states that a "covered entity need not provide the specific accommodation sought by the individual making the request so long as [the covered entity] propose[s] reasonable alternatives that meet the specific needs of the individual or that specifically address the impairment."  Guidance at 56 (citing *Cruz v. Schriro*, 51 Misc.3d 1203(A) (Sup. Ct. N.Y. Cty. 2016) ("[A]n employer is not obligated to provide a disabled employee with the specific accommodation that the employee requests or prefers[.]")).  Consistent with this Guidance, a recent New York case held that a movie theater was not required to acquiesce in a deaf person's preference for captions on the movie screen itself, rather than on a separate external device.  *See Roberman v. Alamo Drafthouse Cinemas Holdings LLC*, 67 Misc. 3d 182, 186 (N.Y. Sup. Ct. 2020).

*Phillips v. City of New York*, 66 A.D.3d 170 (1st Dep't 2009), upon which plaintiffs rely, is not to the contrary.  In *Phillips*, an employee of New York City sought a one-year medical leave so that she could undergo treatment for breast cancer.  The City entertained requests for extended medical leave only for permanent civil service employees and not for employees, such as the plaintiff, who held noncompetitive civil service titles.  The City therefore declined to offer any extended medical leave or even to discuss what accommodations might be appropriate.  After failing to receive any accommodation, plaintiff did not return to work and was

terminated thereafter.  Under these circumstances, the Appellate Division held that the plaintiff stated a cause of action without addressing whether the accommodation was necessary "to enable a person with a disability to satisfy the essential requisites of a job. . . ." N.Y.C. Admin. Code § 8–107(15)(a).  *Phillips* did not hold that, absent undue hardship, an employer is required to provide its disabled employees with whichever specific accommodation he or she requests.  Indeed, as described above, the post–*Phillips* decisions of the Appellate Division, as well as the Guidance provided by the New York City Human Rights Commission, confirm that an employer (or any covered entity) may provide a disabled employee with a different reasonable accommodation than the one the employee prefers.

Nevertheless, plaintiffs argue that language substantially similar (if not identical) to the charge that they requested was erroneous because it is inconsistent with Title II of the ADA, the implementing regulation and guidance of which provides that a Title II entity "must honor the person's choice, unless it can demonstrate that another equally effective means of communication is available . . ." ADA Requirements—Effective Communication, U.S. Dep't of Justice, *available at* https://bit.ly/2LjgXD4; *see also* 28 C.F.R. § 35.160(b). Plaintiffs argue that Title II is relevant here because the City Law "imposes a more liberal interpretation than its federal and state counterparts," and thus Title II's standard is a "floor" below which the City Law cannot fall.  Pl. Br. at 15–16.

Even if plaintiffs had not procedurally forfeited their objection to the language of the charge, an overview of the ADA demonstrates why this argument is without merit.  The ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III."  *Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004).  Plaintiffs do not contest that Lutheran, as a public accommodation, is subject to Title III, not Title II, of the ADA.  Pl. Br. at 13.  Title III's implementing regulation states that "a public accommodation should consult with individuals with disabilities whenever possible  to determine what type of auxiliary aid is needed to ensure effective communication, but the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication." 28 C.F.R. § 36.303(c)(1)(ii).  Indeed, it is ironic that plaintiffs requested a charge from *Giterman*, which cites a Technical Assistance Manual for Title III, yet argue that the charge was erroneous under the inapplicable Title II.  Moreover, contrary to plaintiffs' argument, the charge the jury was given was not inconsistent with Title II's requirements.  Title II itself does not entitle an individual with a disability to his or her preferred means of communication.  Rather, an entity covered by Title II must only honor a disabled individual's preference unless "an equally effective means of communication is

available . . ."  As explained above, and as plaintiffs themselves agreed, whether Lutheran provided plaintiffs with an "equally effective means of communication" was a jury question.

### 2. Weight Of The Evidence

A district court may grant a new trial on the ground that the verdict was against the weight of the evidence pursuant to Rule 59 only if the verdict is "seriously erroneous" or "a miscarriage of justice." *Raedle*, 670 F.3d at 417–18.  In deciding a Rule 59 motion, as the plaintiffs recognize, "a trial judge is free to weigh the evidence himself." *Crawford v. Franklin Credit Mgmt. Corp.*, 2015 WL 1378882, at *7 (S.D.N.Y. Mar. 26, 2015), *aff'd sub nom. Crawford v. Tribeca Lending Corp.*, 815 F.3d 121 (2d Cir. 2016).  Nevertheless, a "high degree of deference [is] accorded to the jury's evaluation of witness credibility," and "jury verdicts should be disturbed with great infrequency." *Raedle*, 670 F.3d at 418.  Where "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case[.]"  *Id.*

Plaintiffs argue that "the Court need not delve too far into witness credibility" because the fact that plaintiffs "received written consent forms in English—without the benefit of an ASL interpreter" is sufficient to entitle them to a new trial.    Pl. Br. at 19.  This argument is a rehash of their Rule 50 motion that they were treated "less well" in relation to the consent forms, which I rejected earlier.  The fact that there

are consent forms, signed by plaintiffs, that do not have a corresponding signature from an ASL interpreter is simply evidence that the jury was free to consider or reject when determining whether plaintiffs were able to effectively communicate with their doctors and provide informed consent. The jury was also free to consider evidence, or the lack of credible evidence, provided by the plaintiffs themselves. And the jury was also free to consider the testimony of the doctors, many of whom had treated plaintiffs for years and who testified that they were able to communicate effectively with plaintiffs without an ASL interpreter, and their signatures on the consent forms certifying that they "explained to [plaintiffs], the nature, purpose, benefits, risks of, and alternatives to" the proposed procedures. *See, e.g.*, ECF No. 109–1 at 1, 13–15, 16, 18–19; ECF No. 109–2 at 3–4, 13–14, 16–17, 30–32; ECF No. 109–3 at 2; ECF No. 109–4 at 3–5.

In sum, the weight of the evidence at trial demonstrated each plaintiff's ability to understand and communicate with their physicians in English and provide informed consent to medical procedures at Lutheran. Indeed, the jury's verdict suggests that it found plaintiffs' testimony not credible, and because that finding is well supported by the record, plaintiffs' motion is denied.

## CONCLUSION

In closing, it bears noting what this case was about. Plaintiffs' counsel "emphasize[d]" in his opening statement that "[t]his is not a medical malpractice

case" and that his focus "is not on whether medical treatment was necessary, whether medical treatment was ultimately successful, no, our focus is not on the medical care itself" but rather on whether plaintiffs had an opportunity to provide informed consent.  Trial Tr. at 32:4–13.  None of the plaintiffs complained about the quality of care they received, nor did they testify credibly that, notwithstanding any alleged flaws in the consent process, they did not understand the explanations they were provided.  Nor did they testify that even in retrospect they would not have consented to the procedures had they known about the risks.  Indeed, Van Vorst declined to undergo a procedure precisely because of the explanation she received.

In sum, plaintiffs had scant prospect of obtaining anything more than nominal damages even if the jury had found Lutheran liable.  Moreover, Lutheran had merged with NYU Langone in 2016—after the treatment about which plaintiffs complained—and NYU Langone changed the complained-of policy, obviating any prospect of injunctive relief.  Trial Tr. at 724:13–728:14.  Nor will the verdict of the jury, or my rejection of plaintiffs' legal argument, make bad law or "have startling consequences on the deaf community," as they suggest.  Pl. Br. at 11. Indeed, plaintiffs acknowledge that in 2018, years after they were treated at Lutheran, the New York City Human Rights Commission provided guidance that a hospital "must provide a qualified sign language interpreter to a patient who is deaf as a reasonable accommodation."  Pl. Br. at 19 (quoting Guidance at 64).  Although this Guidance

cannot be applied retroactively, it cannot be ignored going forward by any hospital in the face of the holding of the New York Court of Appeals that an agency's "interpretation of the statute it administers, if not unreasonable or irrational, is entitled to deference." *Salvati v. Eimicke*, 72 N.Y.2d 784, 791 (1988). While the plaintiffs therefore had no meaningful stake in the outcome, a favorable verdict would have yielded a significant fee for plaintiffs' counsel. I decline to overturn the jury's considered verdict merely to indulge plaintiffs' counsel's quest for fees. Plaintiffs' post-judgment motions are each denied.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York
December 14, 2020

Edward R. Korman
United States District Judge